AO 91 (Rev. 11/11) Criminal Complaint

## UNITED STATES DISTRICT COURT

**LODGED**
CLERK, U.S. DISTRICT COURT

03/14/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP _____ DEPUTY

for the

Central District of California



**FILED**
CLERK, U.S. DISTRICT COURT

3/14/24

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ sl _____ DEPUTY

| | |
|---|---|
| United States of America | |
| v. | |
| Sergio Alexander Aldana, Jose Emmanuel Mayorga, and Ezekiel Daniel Cifuentes | Case No.  5:24-mj-00112 |
| Defendant(s) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of February 29, 2024, in the county of San Bernardino in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 841 | Possession with Intent to Distribute |

This criminal complaint is based on these facts: *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Tyler B. Dominguez, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   March 14, 2024

*Judge's signature*

City and state:   Riverside, California

Hon. David T. Bristow, U.S. Magistrate Judge
*Printed name and title*

AUSA: Sarah E. Spielberger (x3358)

## AFFIDAVIT

I, Tyler B. Dominguez, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.     This affidavit is made in support of a criminal complaint and arrest warrants against Sergio Alexander ALDANA ("ALDANA"), Jose Emmanuel MAYORGA ("MAYORGA"), and Ezekiel Daniel CIFUENTES ("CIFUENTES") for violations of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.     This affidavit is also made in support of an application for a warrant to search the following digital devices in the custody of the Drug Enforcement Administration ("DEA") in Los Angeles, California (collectively, the "SUBJECT DEVICES"), all seized on February 29, 2024 from 8487 Etiwanda Ave Apartment #A, Rancho Cucamonga, California (the "Subject Premises"), as described more fully in Attachment A:

   a.   Black Samsung cellphone, seized from ALDANA and MAYORGA's bedroom ("SUBJECT DEVICE 1");

   b.   Blue Motorola cellphone, seized from ALDANA and MAYORGA's bedroom ("SUBJECT DEVICE 2");

   c.   Black Apple iPhone, seized from ALDANA and MAYORGA's bedroom ("SUBJECT DEVICE 3");

   d.   Black ASUS laptop, seized from ALDANA and MAYORGA's bedroom ("SUBJECT DEVICE 4");

      e.   Grey Android cellphone with a cracked screen in a brown cellphone case, seized from CIFUENTES's bedroom ("SUBJECT DEVICE 5");

      f.   Black Apple iPhone, seized from CIFUENTES's bedroom ("SUBJECT DEVICE 6");

      g.   Grey Android cellphone with a scratched screen, seized from CIFUENTES's bedroom ("SUBJECT DEVICE 7");

      h.   Black LG cellphone, seized from CIFUENTES's bedroom ("SUBJECT DEVICE 8"); and

      i.   Silver Apple iPhone ("SUBJECT DEVICE 9"), seized from CIFUENTES's person.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.

Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.   I have been a police officer with the El Monte Police Department ("EMPD") since 2017.  From 2014 to 2017, I worked as a police officer with the Arcadia Police Department.  I have worked uniformed patrol, gang enforcement.  Since 2023, I have worked as a Task Force Officer with the DEA assigned to the Los Angeles Field Division, Group 5.

6.   I have received 40 hours of narcotics training in recognition, packaging for distribution, use, and the effects of narcotics and other dangerous drugs from the San Bernardino County Sheriff's Academy.  I have received specific training focusing on the impact Mexican Criminal and Drug Trafficking Organizations are having locally throughout the United States, including in California.  This course focused on the strategic overview of the Mexican "Narco" Cartels and emerging trends and updates of the Cartel hierarchy, leadership, and operations within the United States.

7.   I have conducted numerous arrests and investigations related to narcotics users, dealers, and associates.  These investigations and arrests have led to cultivating narcotic users and informants as well as providing drug influence intervention resources to drug addicts.

8.   To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources,

including physical surveillance and the use of various types of informants and cooperating sources.  Through these investigations, and my training and experience, I have become familiar with the methods used by traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect/launder narcotic related proceeds.  My knowledge of these tactics, which include the utilization of debit calling cards, public telephones, the use of couriers to transport narcotics, cellular telephone technology, beepers, counter surveillance, elaborately planned smuggling schemes tied to legitimate businesses, false or fictitious identities, and coded communications and conversations has been particularly useful and relevant to this investigation.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

9.   Based on my investigation in this case, review of investigation reports, and debriefings with law enforcement officers, I am aware that on February 29, 2024, law enforcement arrested ALDANA, MAYORGA, and CIFUENTES after law enforcement searched the Subject Premises pursuant to a state search warrant and found approximately 11.4 gross kilograms of suspected fentanyl pills, 340 gross grams of suspected cocaine, a firearm, and SUBJECT DEVICES 1 through 9.  ALDANA, MAYORGA, and CIFUENTES were all present at and appeared to be living at the Subject Premises at the time of the execution of the search warrant.

### IV.  <u>STATEMENT OF PROBABLE CAUSE</u>

10.  Based on my review of law enforcement reports and search warrants, conversations with other law enforcement

agents, and my own knowledge of the investigation, I am aware of the following:

**A.   Background of Investigation**

11.   In August and September 2023, EMPD Detective Nakamura obtained California state search warrants for two suspected fentanyl dealers' Instagram accounts.  Both accounts were exchanging direct-messages with Instagram handle "elsergi_99011."  Based on Detective Nakamura's training and experience, it appeared that in both conversations "elsergi_99011" was discussing selling fentanyl pills using coded language.

a.   In January 2024, a confidential informant working with EMPD ("CI")[1] told Detective Nakamura that he/she had information about a man named "Sergi", later identified as ALDANA, who was one of the larger fentanyl suppliers in El Monte.  The CI said he/she had first interacted with "Sergi" through Instagram.  The CI said he/she had previously purchased fentanyl from "Sergi", but "Sergi" usually had "runners"[2] who would deliver the narcotics to the CI.  Although the CI only knew the supplier as "Sergi", he/she described "Sergi" as a

---

[1] The CI was arrested in 2019 for petty theft in violation of Cal. Pen. Code § 484(a) and convicted in 2020 for Sale or Transportation For Sale of Methamphetamine in violation of Cal. Health and Safety Code § 11379(a) and driving without a license, in violation of Cal. Vehicle Code § 12500(a).  The CI was also arrested in January 2024 for Possession of Ammunition as a Felon, and he/she and is cooperating for leniency on said charges.

[2] Based on my training and experience, I know that a "runner" is an individual who delivers narcotics on behalf of the primary supplier, and that narcotics dealers often use "runners" to distance themselves from possible prosecution.

younger male, possibly 18 years old, who possibly lived in the Inland Empire.  The CI also believed "Sergi" had recently been arrested for possession of a firearm and narcotics.

 b. The CI said "Sergi" primarily used Instagram accounts with the handles "elsergi909.1" ("ALDANA's primary Instagram account") and "elsergi909.2" ("ALDANA's secondary Instagram account" and collectively with ALDANA's primary Instagram account, "ALDANA's Instagram accounts") to sell narcotics and that his phone number was (909) 214-7413.  While the two Instagram accounts were slightly different than the one Detective Nakamura had previously identified ("elsergi_99011"), Detective Nakamura knew based on his training and experience in investigating drug trafficking offenses that subjects involved in the sales of narcotics will often create new social media accounts on a frequent basis to avoid detection by law enforcement.  As the three account names were very similar, Detective Nakamura suspected that all three Instagram accounts belonged to the same subject.

12.  Using law enforcement databases, Detective Nakamura learned that the phone number provided by the CI was ALDANA's. He also learned that Fontana Police Department had arrested ALDANA and MAYORGA in November 2023 for carrying a loaded firearm, possession for sale of narcotics, transportation of a controlled substance for sales, and possession of a loaded firearm with narcotics.

13.  On January 17, 2024, law enforcement saw the same black Honda in front of 8487 Etiwanda Avenue, Rancho Cucamonga.

They also saw MAYORGA leaving Apartment A (i.e., the Subject Premises).

14.   Soon after, Detective Nakamura obtained a California state search warrant for ALDANA's Instagram accounts.  Based on the evidence obtained from this search warrant, Detective Nakamura concluded that ALDANA controlled and used these accounts.  Specifically, there were numerous "selfie" photographs of ALDANA, along with messages between elsergi909.1 and other accounts where elsergi909.1 responded to the name "Sergio", which is ALDANA's first name.

15.   Detective Nakamura also found photographs of large quantities of blue M30 fentanyl pills, other drugs, and firearms, some with prices attached, in ALDANA's Instagram accounts.  In ALDANA's primary Instagram account, ALDANA direct-messaged with other accounts and discussed, using coded language, selling them large quantities of blue M30 fentanyl pills and firearms.

16.   The direct messages in ALDANA's primary Instagram account also showed that ALDANA used runners such as CIFUENTES to conduct his sales.  From September 25, 2023, to January 15, 2024, ALDANA direct-messaged CIFUENTES's Instagram account, "zeke_03"[3], dozens of messages using coded language that show that CIFUENTES was his fentanyl runner.  For example, on October 28, 2023, ALDANA instructed CIFUENTES to make several deliveries

---

[3] As discussed in Section IV.C, CIFUENTES later confirmed that his Instagram account is "zeke_03".  Instagram search warrant returns also show that "zeke_03" is registered to an individual named Ezequiel Cifuentes, who I believe is CIFUENTES.

of blue M30 fentanyl pills, CIFUENTES would direct-message
ALDANA once he completed the delivery and customers would send
them money via CashApp.  For one transaction, CIFUENTES also
sent ALDANA a picture of the fentanyl pills he had left for
their customer in his/her mailbox.



**Author** elsergi909.1 (Instagram: 61871372316)
   **Sent** 2023-10-28 04:57:35 UTC
   **Body** U wanna do Fontana nd Colton?

**Author** zeke_03 (Instagram: 24381445347)
   **Sent** 2023-10-28 04:57:40 UTC
   **Body** Yeah

**Author** zeke_03 (Instagram: 24381445347)
   **Sent** 2023-10-28 04:57:50 UTC
   **Body** What product

**Author** elsergi909.1 (Instagram: 61871372316)
   **Sent** 2023-10-28 05:00:25 UTC
   **Body** Blues

**Author** zeke_03 (Instagram: 24381445347)
   **Sent** 2023-10-28 05:00:34 UTC
   **Body** Only blues

**Author** zeke_03 (Instagram: 24381445347)
   **Sent** 2023-10-28 05:00:39 UTC
   **Body** Liked a message

**Author** zeke_03 (Instagram: 24381445347)
   **Sent** 2023-10-28 05:00:41 UTC
   **Body** How manny

**Author** elsergi909.1 (Instagram: 61871372316)
   **Sent** 2023-10-28 05:00:53 UTC
   **Body** 14 for 1 bag

17.  On November 12, 2023, CIFUENTES also sent ALDANA a
list of customers, the amounts of blue M30 fentanyl pills they
had purchased, and the amount they paid.  ALDANA responded by
messaging him their customers' addresses so that CIFUETNES could
deliver the fentanyl.





18.  I also believe that ALDANA and CIFUENTES purchased a
firearm together.  On November 10, 2023, ALDANA and CIFUENTES
discussed, using coded language, purchasing firearms sent by
Instagram account "lowk_403".  ALDANA and CIFUENTES exchanged
several photographs of firearms for sale, debated which model to
purchase, and shared Google search results about the differences
between firearms.





19.  Lastly, evidence from ALDANA's Instagram accounts showed that ALDANA used the Subject Premises as a "stash house"[4]. In ALDANA's primary Instagram account, law enforcement found a screenshot of a lease agreement for the Subject Premises in CIFUENTES's name and photographs and videos that appeared to have been taken inside and outside of the Subject Premises. Also, the IP addresses used by ALDANA's primary Instagram account were frequently in the area of the Subject Premises.

---

[4] A "stash house" is a location that large scale narcotics traffickers often use to hide evidence of their illegal activities.  This "stash house" is often at a separate location from where they reside to prevent detection from law enforcement. These traffickers often use "stash houses" as a base for narcotics distribution and for storing narcotics, money, and/or firearms.

ALDANA often set up narcotics deals by direct-messaging customers to meet him in the area surrounding the Subject Premises.  Based on my experience investigating drug trafficking violations, I believe this indicates that the Subject Premises was used to store ALDANA, MAYORGA, and CIFUENTES' stash of narcotics.

| | |
|---|---|
| **Author** aawad.36 (Instagram: 2520332459)<br>**Sent** 2023-12-19 22:08:18 UTC<br>**Body** Okay bet send addy if you can | **Author** t3extraouttk (Instagram: 60037445294)<br>**Sent** 2023-12-19 04:36:13 UTC<br>**Body** I need a jar |
| **Author** aawad.36 (Instagram: 2520332459)<br>**Sent** 2023-12-19 22:08:19 UTC<br>**Body** You have blow | **Author** elsergi909.1 (Instagram: 61871372316)<br>**Sent** 2023-12-19 04:37:56 UTC<br>**Body** Can u pick up pa? |
| **Author** aawad.36 (Instagram: 2520332459)<br>**Sent** 2023-12-19 22:08:20 UTC<br>**Body** Right | **Author** t3extraouttk (Instagram: 60037445294)<br>**Sent** 2023-12-19 04:47:51 UTC<br>**Body** Where |
| **Author** elsergi909.1 (Instagram: 61871372316)<br>**Sent** 2023-12-19 22:08:23 UTC<br>**Body** Arrow nd etiwanda | **Author** elsergi909.1 (Instagram: 61871372316)<br>**Sent** 2023-12-19 04:50:12 UTC<br>**Body** Etiwanda and arrow |

**Author** the.higher.crew (Instagram: 2050878237)
**Sent** 2024-01-06 00:57:47 UTC
**Body** Ight I'm need 2 boat and the extra can u put it in a different bag

**Author** elsergi909.1 (Instagram: 61871372316)
**Sent** 2024-01-06 00:59:30 UTC
**Body** Fsfs

**Author** the.higher.crew (Instagram: 2050878237)
**Sent** 2024-01-06 00:59:41 UTC
**Body** 11 right

**Author** elsergi909.1 (Instagram: 61871372316)
**Sent** 2024-01-06 00:59:49 UTC
**Body** Yessir

**Author** the.higher.crew (Instagram: 2050878237)
**Sent** 2024-01-06 01:02:59 UTC
**Body** Whst street station

**Author** elsergi909.1 (Instagram: 61871372316)
**Sent** 2024-01-06 01:03:29 UTC
**Body** Arrow nd etiwanda

**Author** the.higher.crew (Instagram: 2050878237)
**Sent** 2024-01-06 01:04:29 UTC
**Body** Be their in 7 min so 2 b and 50 on the side I got 8 cash 3 cash app

20.  On February 22, 2024, Detective Nakamura obtained a California state search warrant signed by Superior Court Judge Rob Villeza authorizing the search of (1) the Subject Premises; (2) ALDANA's suspected home located at 1720 East D Street #12F, Ontario, California; (3) ALDANA's suspected Corvette; (4) CIFUENTES's suspected Lexus sedan; and (5) the persons of ALDANA, MAYORGA, and CIFUENTES.

**B.  Law Enforcement Found Approximately 11.4 Gross Kilograms of Suspected Fentanyl, Approximately 340 Gross Grams of Suspected Cocaine, a Firearm, and the SUBJECT DEVICES at the Subject Premises**

21.  From my review of reports and discussions with other law enforcement personnel, I learned the following:

a.  On February 29, 2024, at 5:00 a.m., law enforcement executed the search warrants on (1) the Subject Premises; (2) 1720 East D Street #12F, Ontario, CA,[5] (3) ALDANA's suspected Corvette, (4) CIFUENTES's suspected Lexus, and (5) the persons of ALDANA, MAYORGA, and CIFUENTES.

b.  The EMPD SWAT team executed the search warrant at the Subject Premises.  EMPD SWAT personnel loudly announced their police presence and their intent to serve a search warrant at Subject Premises.  After no response, SWAT personnel breached the front door.

c.  SWAT personnel ordered all occupants to the front door, and noted that the SUBJECT PREMISES was a two-bedroom

---

[5] Law enforcement did not find contraband at 1720 East D Street #12F, Ontario, CA.  The occupants, ALDANA's father Aldana Sr. and Estella Padilla, said ALDANA did not stay there often.

apartment with one bedroom on the east and the other on the west.

        d.   MAYORGA first came out of the eastern bedroom ("ALDANA and MAYORGA's bedroom" or the "eastern bedroom") and law enforcement detained him.  ALDANA next came out of the eastern bedroom and law enforcement detained him.  CIFUENTES then came out of the western bedroom ("CIFUENTES's bedroom" or the "western bedroom") and law enforcement detained him.

        e.   Law enforcement searched the eastern bedroom and found indicia that MAYORGA and ALDANA lived in that room. Specifically, law enforcement found MAYORGA's California identification card on top of the refrigerator, ALDANA's California identification card in the bathroom adjoining the bedroom, and men's clothing in the closet. Law enforcement also found approximately 11.4 gross kilograms of blue M30 pills suspected to contain fentanyl[6] and 340 gross grams of suspected cocaine.  Specifically, I am aware that officers found in their search of the eastern bedroom:

        i.   Eight bags containing numerous blue M30 suspected fentanyl pills in the closet on top of a shelf and in plain view upon entering the bedroom, pictured below;

---

[6] DEA later weighed the suspected fentanyl pills and concluded that they weighed approximately 13.2 gross grams, but this appears to have included the evidence bags law enforcement placed the pills in.



      ii.   A black backpack between the mattress and closet containing numerous of blue M30 suspected fentanyl pills, pictured below;



      iii. A safe in the closet that law enforcement forced open with 16 bags containing numerous and ten bags containing approximately 290 gross grams of suspected cocaine, pictured below;



       iv.   A plastic baggie containing approximately 50 gross grams of suspected cocaine on top of the refrigerator near MAYORGA's identification card;

       v.    Three loose pills on top of the refrigerator, two blue M30 suspected fentanyl pills and one multi-colored, both near MAYORGA's identification card;

       vi.   Two baggies containing approximately 170 gross grams of brown pills in the top drawer of the closet;

       vii. Loose blue M30 suspected fentanyl pills in the top drawer of the closet;

       viii.    Two baggies with suspected cocaine on the south side of the closet; and

       ix.   A small bag containing several blue M30 suspected fentanyl pills inside of a storage shed on the adjoining balcony.

       f.   Also inside the eastern bedroom, law enforcement found items that I believe, based on my training and experience

in investigating drug trafficking offenses, are indicia of narcotics trafficking.  Specifically, they found:

  i. Three digital scales inside of a drawer in the closet.  Based on my training and experience in investigating drug trafficking offenses, I know that individuals who possess narcotics with the intent to distribute them often keep scales with them in order to weigh their narcotics prior to sale.

  ii. SUBJECT DEVICES 1 through 3 on the floor between the closet and mattress, along with SUBJECT DEVICE 4 next to the black backpack containing suspected fentanyl.  Based on my training and experience, I know that drug traffickers often use cellular telephones to communicate with co-conspirators in furtherance of their drug trafficking activities.

  iii. Bags containing multiple smaller zip-loc baggies in the top drawer of the closet. Based on my training and experience, I know that narcotics traffickers often keep small zip-loc baggies to package and distribute their narcotics.

  g. Law enforcement also searched the western bedroom and found indicia that CIFUENTES lived in this bedroom. Specifically, they found CIFUENTES's work identification card and his California identification card inside of the top drawer of the nightstand next to the bed.

  h. Law enforcement also initially found the following items in CIFUENTES's bedroom:

       i.   An empty Glock firearm box containing two unloaded magazines in the closet; and

       ii.  SUBJECT DEVICES 5 through 8 on the top drawer of the nightstand.

    i.   Law enforcement searched CIFUENTES and found SUBJECT DEVICE 9.

    j.   Law enforcement searched ALDANA and found $2,112.00 in cash, along with keys to his Corvette, which was parked in front of 1720 East D Street #12F, Ontario, CA.  Law enforcement then searched the Corvette pursuant to their warrant and found a document addressed to ALDANA's parents regarding ALDANA.

**C.   ALDANA, MAYORGA, and CIFUENTES's Statements**

22.  After law enforcement finished searching the SUBJECT PREMISES, Detective Nakamura interviewed ALDANA prior to arresting him.  ALDANA admitted that he knew MAYORGA and CIFUENTES, but denied any involvement in drug trafficking. Detective Nakamura then placed ALDANA under arrest, administered the Miranda warnings, and ALDANA invoked his right to counsel.

23.  Detective Nakamura then interviewed MAYORGA after administering the Miranda warnings.  MAYORGA waived his Miranda rights and admitted he had been staying at the SUBJECT PREMISES for about a month but would not say which room he lived in.

24.  Detective Nakamura also interviewed CIFUENTES after administering the Miranda warnings.  CIFUENTES waived his Miranda rights and said that the western bedroom, which law enforcement saw him coming out of, was his.  CIFUENTES stated

that he rented a room in the Subject Premises to ALDANA, and that MAYORGA went wherever ALDANA went.  CIFUENTES confirmed that his Instagram account was "zeke_03", which was the account that ALDANA had previously direct-messaged using ALDANA's primary Instagram account instructing where and how to deliver and sell fentanyl pills.

25.  CIFUENTES also said that he had a Glock 26 firearm in his bedroom.  Law enforcement went back to CIFUENTES's bedroom and saw the outline of a handgun inside the zippered portion of the mattress in the middle of the room.  They unzipped the mattress and saw a black, unloaded, semi-automatic Glock 26 handgun, serial number BVK671.  Law enforcement later learned from running the serial number through law enforcement databases that an unidentified individual had stolen this firearm in October 2023 from a firearm store in Murietta, California.

26.  Law enforcement placed ALDANA, MAYORGA, and CIFUENTES under arrest for possession for sales of narcotics.

**D.  Drug Tests**

27.  On February 29, 2024, Detective Nakamura conducted a TruNarc test on the suspected cocaine, which resulted in a positive reading for cocaine.

28.  Based on my training and experience, I believe that the recovered blue M30 pills are fentanyl pills.  DEA sent the pills to the DEA lab for testing on March 5, 2024, and test results are pending.  On February 29, 2024, Detective Nakamura conducted a TruNarc field test on the blue M30 suspected fentanyl pills, which resulted in a positive reading

for Acetaminophen but could not rule out the presence of a narcotic.  Based on my experience investigating fentanyl trafficking, this TruNarc result is consistent with the narcotics ultimately testing positive for fentanyl following lab testing because TruNarc is often unable to detect fentanyl in blue M30 fentanyl pills and instead provides a positive reading for Acetaminophen.  I also believe that the recovered blue M30 pills are fentanyl based on my experience speaking with fentanyl users and suppliers, who say that blue M30 pills frequently contain fentanyl.  My belief is also based on and is consistent with ALDANA sending Instagram direct-messages telling purchasers that he is selling "blues," which I know from training and experience to be blue M30 fentanyl pills.

### V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

29.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the

manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

      c.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d.  Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

      e.  Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

30.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.  Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.  Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience,

individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

### VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

31.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

32.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary

directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

33.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

   a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

   b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

34.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

## VIII.    <u>CONCLUSION</u>

35.  For all of the reasons described above, there is probable cause to believe that ALDANA, MAYORGA, and CIFUENTES have committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

/s/
_____
Tyler B. Dominguez, Task Force Officer
DRUG ENFORCEMENT ADMINISTRATION

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 14th day of March, 2024.

_____
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"), seized at 8487 Etiwanda Ave Apartment #A, Rancho Cucamonga, California (the "Subject Premises") on February 29, 2024, and currently maintained in the custody of the Drug Enforcement Administration in Los Angeles, California:

 a. Black Samsung cellphone, seized from ALDANA and MAYORGA's bedroom at the Subject Premises ("SUBJECT DEVICE 1");

 b. Blue Motorola cellphone, seized from ALDANA and MAYORGA's bedroom at the Subject Premises ("SUBJECT DEVICE 2");

 c. Black Apple iPhone, seized from ALDANA and MAYORGA's bedroom at the Subject Premises ("SUBJECT DEVICE 3");

 d. Black ASUS laptop, seized from ALDANA and MAYORGA's bedroom at the Subject Premises ("SUBJECT DEVICE 4");

 e. Grey Android cellphone with a cracked screen in a brown cellphone case, seized from CIFUENTES's bedroom at the Subject Premises ("SUBJECT DEVICE 5");

 f. Black Apple iPhone, seized from CIFUENTES's bedroom at the Subject Premises ("SUBJECT DEVICE 6");

 g. Grey Android cellphone with a scratched screen, seized from CIFUENTES's bedroom at the Subject Premises ("SUBJECT DEVICE 7");

 h. Black LG cellphone, seized from CIFUENTES's bedroom at the Subject Premises ("SUBJECT DEVICE 8"); and

 i. Silver Apple iPhone ("SUBJECT DEVICE 9"), seized from CIFUENTES's person.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), namely:

a.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

      d.   Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs, guns, or ammunition were bought, sold, or otherwise distributed;

      e.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs, guns, or ammunition;

      f.   Contents of any calendar or date book;

      g.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

      h.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

      i.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

        i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.   evidence of the presence or absence of software that would allow others to control the device, such as

viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, biometric keys and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

II.  __SEARCH PROCEDURE FOR DIGITAL DEVICES__

3.  In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.  The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.  The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital devices beyond this 120-day period without obtaining an extension of time order from the Court.

d.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.  The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or

v

encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.  If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.  If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.  If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies

of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not

apply to any search of digital devices pursuant to any other
court order.